## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| USG Corporation, *et al.*, | ) | Case No. 01-2094 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Docket No. 10901** |

## CERTAIN SPEIGHTS & RUNYAN CLAIMANTS' RESPONSE TO DEBTORS' TENTH OMNIBUS OBJECTION TO AND MOTION TO DISALLOW ASBESTOS PROPERTY DAMAGE PROOFS OF CLAIM FOR FAILURE TO PROVIDE IDENTIFICATION EVIDENCE (SUBSTANTIVE OBJECTION)

Speights & Runyan ("S&R") hereby responds to the Tenth Omnibus Objection to and Motion to Disallow Asbestos Property Damage Proofs of Claim for Failure to Provide Identification Evidence (Substantive Objection)("Objection") filed by the Debtors ("USG") as follows:

## I. INTRODUCTION

When USG filed its proposed Plan of Reorganization ("Plan"), it represented that any unsettled property damage ("PD") claims would be passed through to the tort system. For reasons still unknown and unfathomable to S&R, USG now has chosen to object to all PD claims. USG's present Objection demonstrates why its reversal of course is nonsensical, especially since it has told the Court that allowing PD claims to go back to the tort system will in no way undermine its Plan.

## II. ARGUMENT

### A.    USG's Product Identification Objection Should Be Denied

USG argues that claims listed in its attached Exhibits A, B, C, D, and E should be stricken "on the grounds that claimants have failed to provide any evidence that the Debtors' asbestos-containing products are or were ever installed in the buildings at issue at any time relevant to these

claims." Objection at 1. The request should be denied. As set forth below, product identification

is not required in an asbestos property damage case. In addition, S&R has provided product

identification evidence for many of the buildings subject to USG's Motion. Lastly, to the extent that

product identification is both required and deemed to be insufficient, then consideration of USG's

request should be deferred until after it responds to S&R's requests for admissions.

    1.    **Exhibit A Claims**

        a.    Claimants Do Not Have to Show Product Identification

USG asserts that, "The [40] claimants listed on Exhibit A have failed to offer any evidence

in support of their allegations that Debtors' products are present in their buildings." Objection at 4.

The short answer to this assertion is that the claimants do not have to show product identification.

As USG knows from its litigation of the class action on behalf of the nation's schools, the Third

Circuit recognized conspiracy as one of the central causes of action leading it to uphold certification

of the class against USG and its fellow defendants. In Re Asbestos School Litigation, 104 F.R.D.

422 (E.D. Pa. 1984), aff'd in part and vacated in part, 789 F.2d 996 (3d Cir. 1986) ("Schools Class").

Upon remand, the District Court dealt with the conspiracy count in a series of orders.

Apparently the first of these orders dealt with a challenge to the conspiracy cause of action in a

summary judgment motion filed by the defendant, C. Tenant. After finding that there was no

evidence associating the defendant with the class representatives' school buildings, (i.e. there was

no product identification), which was dispositive of the negligence and breach of warranty claims,

the Court denied summary judgment on the conspiracy and intentional tort causes of action, holding

that "a genuine issue of material fact exists with respect to whether the C. Tenant indeed participated

in any purposeful action by which it concealed or withheld knowledge it may have had concerning

the dangerous properties of asbestos." Memorandum and Order (October 30, 1990) at 10 [TAB A]. The Court specifically found that it was reasonable to infer that the defendant "knowingly participated in the conspiracy to withhold information alleged by the plaintiff." Id.

The Court later dealt with other challenges to the conspiracy count, although it is unclear at this moment whether USG ever had the temerity to raise that issue given the conspiracy evidence against it as summarized below. One of the Court's Orders dealt with a challenge to plaintiffs' conspiracy and concert of action theories by defendant Pfizer. Although the Court found that there was no evidence that Pfizer belonged to any asbestos trade associations or industry groups during the period that it marketed its asbestos-containing product, it upheld these counts because it found that "there is evidence by which a jury could reasonably find that Pfizer later joined on ongoing conspiracy/concerted action by its involvement with, and financial support for, an organization known as the Safe Buildings Alliance ('SBA')." Order (October 26, 1993) at 1-2. [TAB B].

The Court's ruling against Pfizer is particularly instructive as to USG. Although Pfizer was not a member of SBA, but contributed to its financing, USG was a founding member of this organization, and the Court and the Third Circuit earlier had found that SBA was USG's alter-ego. In re Asbestos School Litigation, 115 F.R.D. 22, 24 (E.D. Pa. 1987), judgment vacated, 842 F.2d 671 (3rd Cir. 1988).[1] In its opinion denying Pfizer's motion, the Court specifically found that "SBA's actions could reasonably be interpreted by a jury as contributing to an ongoing conspiracy to conceal the asbestos industry's alleged knowledge of the dangers of asbestos." [Tab B at 4]. In

---

[1] Although not directly pertinent to the conspiracy issue, it is also noteworthy that USG's membership in the SBA may toll the applicable statute of limitations. T.H.S. Northstar Associates v. W.R. Grace & Co.-Conn., 860 F.Supp. 640 (D.Minn. 1994).

addition, the Court noted that "Plaintiffs have submitted evidence that SBA was formed after Hill

& Knowlton ("H&K"), U.S. Gypsum's public relations advisor, recommended to U.S. Gypsum the

formation of a coalition composed of members confronted with asbestos-related property damage

suits." Id. The Court cited a 1983 memorandum in which H&K stated that it form an industry

coalition with members confronted with similar lawsuits, either alone or "under the aegis of an

appropriate trade organization" because "a single company confronting what has become a national

issue does not have the manpower or even the resources to effectively challenge or modify

preconceptions," and "we believe the public opinion climate could have a direct relationship to

verdicts in these cases. However, resource sharing and concerted action can shore up credibility and

maximize impact." Id. Finally, the District Court observed that, "The H&K memo goes on to say

that the most effective goal of a public relations campaign should be to convince the public that,

"There are no proven health hazards associated with Audicote or another similar product, and, the

manufacturer of Audicote, and similar products, are not liable for recovery costs and/or punitive

damages." Id. at 4-5 (citations omitted).

Subsequently, the case was set down for trial with the Phase I to be a conspiracy trial. USG

and all other defendants settled.

b.    The Conspiracy Evidence Against USG is Overwhelming

The District Court's Pfizer opinion is more than enough to show why claimants have a viable

conspiracy claim against USG, thus obviating the need for product identification. However, the

Court there only commented indirectly about USG's conduct in the 1980's which was relevant to

Pfizer's motion. In fact, USG efforts to conceal the truth about asbestos dangers goes back at least

to the 1930's, and includes its cover up of a cache of documents discovered by its corporate counsel

4

in the 1970's, which led it to Hill and Knowlton and the SBA. The following is only a brief summary of the type of evidence that S&R has developed in support of its conspiracy count (and its response to USG's statute of limitations defense).

In 1930, two British investigators, Dr. E.R.A. Merriweather and C.W. Price, published their landmark "Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry." [TAB C]. The report conclusively established the link between asbestos and asbestosis, and led to the promulgation of British regulations on the use of asbestos in certain industries. Id.

In 1931, the English firm, Turner & Newall Company ("T&N") now a subsidiary of Federal Mogul ("Mogul"), introduced Limpet, the first spray-applied asbestos-containing product, and began spraying it in public facilities. [TAB D]. The Lancet, then and now one of the most respected British medical journals, immediately expressed grave concern that should the experiment lead to an extensive use of this method for deadening noise, "then a large increase in industrial pulmonary asbestosis may be expected in years to come." Id. Despite this warning, T&N continued to market Limpet and later introduced it into the United States through its American subsidiary, Keasbey & Mattison ("K&M"). Other companies, such as USG, later marketed similar products.

In 1936, USG retained the services of Dr. Leroy Gardner of Saranac Lake Laboratory, Saranac, New York, to study its Jersey City Plant. On July 31, 1936, Dr. Gardner reported a number of cases of asbestosis at the plant, and specifically advised USG that "there is no standard for safe concentration of asbestos dust" and "it is not possible . . . to establish the maximum safe condition of asbestos in the air." [TAB E]. The following year, a bookkeeper at the plant, whose office was segregated from the factory where asbestos was used by at least 200 feet, developed asbestosis. [TAB F].

That same year, USG, T&N (through K&M), Johns-Manville and other asbestos companies entered into a "Memorandum of Agreement" for Dr. Gardner to perform animal experiments with asbestos dust. [TAB G]. The study was designed to gather ammunition to defend the companies against asbestos-related lawsuits. As such, the results were to be disclosed only if they were "of the right type." In a separate letter forwarded to Dr. Gardner at the same time the Memorandum of Agreement was executed, the sponsors emphasized that "the results obtained will be the property of those who are advancing the required funds, who will determine whether, to what extent and in what manner they shall be made public." [TAB H]. When Dr. Gardner attempted to discuss his findings several years later, the sponsors strongly objected that Dr. Gardner was not living up to his agreement and noted that, "The reports may be so favorable to us that they would cause us no trouble, but they might be just the opposite, which could be very embarrassing." [TAB I].

For over forty years, no one outside the asbestos industry knew what Dr. Gardner had really found which prompted that strong reaction. Dr. Gardner's final report, published posthumously in 1951, gave no indication of any information which could be embarrassing to the sponsors. In the early 1980's, however, Dr. Gardner's 1943 report, entitled "Monograph," was discovered during a document production of T&N in England. [TAB J]. The Monograph, which had been provided to the sponsors, but never before produced, reflected that Dr. Gardner had discovered that one group of white mice that had been inhaling asbestos dust showed an excessive incidence (81.8%) of pulmonary cancer. Id.

Almost as significant as Dr. Gardner's unpublished findings concerning the association between asbestos and cancer were his findings, consistent with his earlier 1936 report to USG, that there was no known safe level of exposure to asbestos. Id. In the original instructions given to Dr.

6

Gardner, his first task was to determine "what concentration of dust is necessary to produce the fibrosis of the lungs which is designated as asbestosis." [TAB H]. In 1938, the Public Health Service had published a study which showed that workers exposed to more than five million particles per cubic foot (MPPCF) of total dust in the air of asbestos plants clearly developed asbestosis. However, in his 1943 Monograph, Dr. Gardner accurately explained in some detail why the proposed standard and the analytical methods upon which it was based were "probably unreliable." [TAB J]. Tragically, Dr. Gardner's findings remained secret, and in 1946 the American Conference of Government Industrial Hygienists ("ACGIH") adopted a "tentative" TLV for asbestos of five million particles per cubic foot of total dust. Of course, the 1938 study upon which it ostensibly had been based showed asbestosis under the level, and in any event the TLV had no applicability to the unrevealed cancer risk.

Although Dr. Gardner's 1943 Monograph was discovered in the 1980's, it was not until Manville's documents became available after it declared bankruptcy that the truth finally surfaced. These documents proved that during the 1940's, when the severity of the asbestos hazard in this country had been effectively concealed, the sponsors were aware that other countries were beginning to take measures to deal with the problem. The American asbestos industry was particularly concerned that Canadian investigators were about to publish damaging statistical information on exposure to asbestos workers in Canada. With this mounting foreign evidence, and the specter of litigation, the sponsors of the study pressured Saranac for a more favorable final report to combat increasing asbestos-related claims while repeatedly reminding the laboratory of its agreement to submit any manuscripts to the sponsoring companies before publication. As shown below, the sponsors repeatedly insisted that all references to cancer should be omitted.

7

Publication of the final report was delayed for several years by World War II. Dr. Gardner then died unexpectedly in 1946. The sponsors then had their intermediary, Dr. Anthony Lanza of the Metropolitan Life Insurance Company, contact Dr. Kenneth M. Lynch of the Medical College of Charleston, South Carolina to ask him to edit Dr. Gardner's paper. [TAB K]. After reviewing the manuscript, Dr. Lynch advised Dr. Lanza that he believed Dr. Gardner's report should be published as it was written. [TAB L]. The sponsors were obviously unhappy with Dr. Lynch's proposal that Dr. Gardner's report, including mention of cancer, be published. They shifted gears, abandoned Dr. Lynch, and proposed that Dr. Lanza begin work with Dr. Arthur Vorwald, the new Director at Saranac Lake, to revise the report and that "everyone understands that this will be checked by all concerned before it is published and Van Brown is in touch with other participating companies about this." [TAB M]. Over the next several months, the sponsors sought to get Dr. Gardner's report in the proper form.

On October 27, 1948, Manville's Vandiver Brown wrote USG and the other sponsors, transmitting a copy of the proposed report, containing the references to cancer, with "the request that you treat it with the utmost confidence and make it available to no one outside your organization." [TAB N]. Attached to the letter was an earlier letter he had prepared in which he suggested eliminating reference to cancer from the report, limiting the report to animal experimentation and not including the human data in Dr. Gardner's draft. Id. Mr. Brown emphasized that:

> [P]lease see that the draft of the report is returned to me on or before November 11 either by mail or by your representative. It is obviously undersirable that the report in its present form receive any distribution or publicity outside a limited number of people in our respective organizations.

The sponsors then met several weeks later in New York City and unanimously agreed "that the

reference to cancer and tumors should be deleted and this is a point we will insist upon ...." [TAB O] The last paragraph of Mr. Brown's letter summarizing the meeting explains why no copies of the report had been uncovered until the T&N document production:

> We have retrieved all of the copies of this tentative and confidential report except the one we sent you, which I note Dr. Hamlin would like to keep. I wish, however, you would prevail upon him to return it to us. Everyone felt it would be most unwise to have any copies of the draft report outstanding if the final report is to be different in any substantial respect. The feeling of the representatives of the various companies was very emphatic on this point.

Saranac agreed to the changes, and the published report omitted all references to cancer. Mr. Brown reported to the sponsors that he had received a revised version of the report and "I have examined this carefully and I believe it adopts the substance of all the suggestions that were made by representatives of the underwriting group with respect to the report of September 30, 1948." [TAB P]. Mr. Brown continued that "as the findings are generally favorable, we have renewed our request that Saranac Laboratory arrange for the publication of the report as promptly as possible". Id. The sanitized report finally appeared in January of 1951 in the AMA Archives of Industrial Hygiene and Occupational Medicine, and the sponsors circulated the edited version of the report to lawyers, government officials, universities, medical schools, and libraries. USG and its co-conspirators had accomplished their goal -- an incomplete report was published omitting all references to cancer and the knowledge that Dr. Gardner had found an excessive incidence of cancer in 1943. The trail that other researchers would certainly have followed was now cold.

With that unpleasantness out of the way, USG and other the major American producers of asbestos-containing construction products were positioned to market their products when building construction took off as a result of the "baby boom." USG introduced new acoustical plasters, textures, and fireproofing products and bombarded building owners, architects, and various

9

associations with advertisements representing that their products were "safe", "perfect", "ideal", "harmless" etc. for building ceilings and steel structures. [TAB Q]

In the late 1950's, however, Dr. J.C. Wagner began to discover a large number of cases of a previously rare form of cancer called mesothelioma among persons living in South Africa. [TAB R]. The only common link which Dr. Wagner could find among these persons was that they were exposed to asbestos. Although some of the persons had been occupationally exposed by working in the South African asbestos mines, others had received their exposure merely by living in the same household with an asbestos worker, by working with in-place asbestos-containing materials, or by "chance environmental exposure." Dr. Wagner noted that, "In a number of patients the exposure to asbestos dust appears to have been slight." USG's Safety Director, Gerhardt Krug, read the accounts reporting Dr. Wagner's findings and circulated them to USG's senior management. [TAB S].

In this country, Dr. Irving Selikoff and his group at Mt. Sinai Hospital in New York had begun to document "an exceedingly high incidence of mesothelioma and lung cancer" among insulation workers who applied and, more importantly, ripped out asbestos materials in buildings. [TAB T]. By 1965, the reports of asbestos disease had become so widespread that two international meetings on asbestos and disease were held in New York City. The meetings were attended not only by leading physicians and scientists around the world, but by representatives of the asbestos industry and their insurers. A consultant to one asbestos company reported back that "there is an irrefutable association between asbestos and cancer," substantial evidence that cancers have developed in environmentally exposed groups, and that slight and intermittent exposure may be sufficient to produce cancer. [TAB U]. However, that same year, USG entered into an agreement to manufacture another and probably more dangerous type of asbestos-containing fireproofing. [TAB V].

During the late 1960's, in presentations to industry and government representatives, Dr. Selikoff continued to speak out about the dangers of spray-applied asbestos to persons involved in the installation of the material and to persons who worked in the buildings and were involved in renovation and demolition activities. [TAB W]. Finally, in 1973, EPA issued the NESHAPS Regulation, which prohibited the spray application of asbestos-containing products for fireproofing or insulation purposes, and required the separate (and expensive) removal of friable asbestos-containing products upon demolition (and later renovation) of a building.

Until EPA adopted regulations which began to restrict the practice in 1973, tons of such material would be placed in America's buildings. In no instance did USG warn the building owners or the architects of the dangers associated with asbestos -- USG did not even inform the building owners or architects that the products had asbestos in them, much less what it knew about asbestos and its cancer causing properties or that there was no known safe level of exposure. USG did not tell its customers that upon disturbance of the material, or upon renovation or demolition of a building, its property would be injured by the release of asbestos fibers. In no instance did USG inform building owners there were numerous alternatives to asbestos products. As a result, huge amounts of USG's asbestos products were placed in buildings all over the country. Moreover, when EPA did act, USG found a loophole and continued to sell some of its asbestos-containing ceiling products which were marketed for decorative rather than for fireproofing or insulation purposes. USG also continued to sell its products in Canada, where they had not been banned.

In the late 1970's, USG was named as a defendant in several asbestos personal injury lawsuits. At this point, USG, which had concealed Dr. Gardner's findings and gone about selling its asbestos products without any warnings, commenced another cover-up as great, if not greater than

11

its conspiracy with the other asbestos companies to conceal the Saranac findings. The relevant facts are outlined in the Order of the Honorable William W. Wilkins, Jr., then a District Court Judge in South Carolina and now Chief Judge of the Fourth Circuit. [TAB X].

In 1979, Thaddeus Snell, USG's Vice President and Corporate Counsel, and Suzanne Torrey, USG's senior litigation attorney in charge of defending asbestos cases, reviewed an edition of the Asbestos Litigation Reporter, which printed a copy of the 1936 Memorandum of Agreement that recently had been discovered in connection with the asbestos personal injury litigation. The Agreement reflected that it had been signed by USG's Secretary-Treasurer (later President and Board Chairman), C. L. Shaver. Mr. Snell promptly interviewed Mr. Shaver, who maintained an office at USG's corporate headquarters, and who stated that the signature appeared to be his. Nevertheless, USG would deny this fact for a number of years.

During this period, EPA became increasingly concerned about the presence of asbestos in school buildings and provided school districts some literature on the situation. A number of building owners contacted USG to determine whether their products contained asbestos, and if so, what steps should be taken. In response, USG assured building owners that it was not aware of nor could it conceive of a hazardous exposure resulting from a properly installed and maintained USG product. [TAB Y]. USG provided no warnings about the problems which the building owners would face in conducting renovations or demolition activities.

In 1980, a paralegal working directly under the supervision of Ms. Torrey, discovered several boxes of documents in a storage room at USG's corporate headquarters. These documents unquestionably established the early and longstanding relationship between USG and Saranac, including Dr. Gardner's 1936 study of its Jersey City Plant and correspondence and other documents

concerning Dr. Gardner's animal experiments. Ms. Torrey discussed the documents with Mr. Snell, who directed that they not be revealed in discovery. As discussed below, for over five years, Mr. Snell's directive was obeyed despite numerous discovery requests and specific Court Orders.

Beginning in May 1981, school districts began to sue USG for recovery of costs associated with the removal of its asbestos containing Audicote acoustical plaster. Before responding to any discovery in the property damage cases, Ms. Torrey checked out the original laboratory research files on Audicote; according to Ms. Torrey, she "lost" these original files sometime during the period 1981-1983.

In response to early discovery in the South Carolina school cases, USG objected "to producing any information related to any other product manufactured and sold by it containing asbestos or for any period manufactured and sold at a time period outside the time space allowed in plaintiff's complaint." Counsel promptly served a Motion to Compel, which was granted by the Court in no uncertain terms:

> THE COURT: You are telling me if I put radium in a bowl of cereal that has got corn flakes that you can't ask what the radium did if I had it in shredded wheat. I don't think it's limited, I think the question is, as your opponent puts it, what did you know about the likelihood of danger to health and products that used asbestos. I plainly think that it is relevant, highly material to this case, whatever his theory of recovery, whatever his theory.

* * *

> THE COURT: But I can't see a ghost of a reason why you would not be compelled to reveal what you know about asbestos...

> THE COURT: ...I mean this is a federal court, the cards are on the table, and you can't hind behind this getting at the truth, what you know about this product, whether you reasonably should have known about it, about its dangerous consequences. It's all got to come out. All of it.

13

Following this ruling, USG repeatedly responded under oath that it had "fully responded to notice discovery," and that it did not know of the dangers of asbestos until the late 1960's or 1970's. In response to specific questions, USG then denied under oath that it had ever performed, sponsored, financed, or received the results of any studies or tests performed by Saranac; that it conducted any dust studies in any of its asbestos product manufacturing facilities; or that it (or anyone on its behalf) conducted, sponsored, or contributed financially to any studies or research to determine if the inhalation of asbestos may be harmful. All the foregoing answers were not only false, but known by USG's corporate counsel to be false in light of the documents discovered by its legal staff in 1980.

S&R filed a Motion to Compel, which was heard by the Honorable William W. Wilkins, Jr., now Chief Judge of the Fourth Circuit. On January 9, 1983, Judge Wilkins granted the Motion in no uncertain terms:

> I place all the parties on notice that this Order is being issued with the Court's full understanding and intention to apply Rule 37(B)(2)(C) to any offending party of this Order, which will include the Court entering a default judgment or dismissing the action against the offending party.

> There must be a time where these matters are laid to rest and you get on to new business and the business of resolving this controversy.

> All the Defendants shall answer within 30 days. I might add that the Court is going to review the responding Answers with its interpretation of good faith, reasonable effort to comply, and will not deal nor allow justification to be based on semantics.

> All Defendants shall answer this Interrogatory that the Court propounds, which is perhaps a combination of numbers that have already been propounded. The date that the company or its officers or its agents or its employees, to the best of that company's ability, must state the date that these individuals received information, written or oral, first became aware of, first became suspicious of the fact that asbestos may be a harmful substance, and all similar information since that first date.

> This includes information acquired individually by the company, its officers, agents, employees, and information that was generally known in the industry. And it also

14

includes any facts, any data, any reports, any opinions which tend to support the belief that asbestos is a harmful product to health.

USG then responded to this Court Order, and stated under oath that it had some knowledge of an association between asbestos and asbestosis (but not cancer) as early as 1948, but again denied any association with Saranac, and again failed to reveal its early participation in the various studies reported above or to reveal any pre-1948 operating bulletins. In response to another Court Order, USG filed an Affidavit of Ms. Torrey stating that "no other documents have been located."

Instead of responding truthfully to discovery, USG chose to continue the concealment it had begun in 1936 by hiring H&K (the public relations firm discussed by the Court in the Schools Class) for the purpose of making "confidential recommendations to contain Audicote controversy." In response, H&K prepared a lengthy report dated July 22, 1983 in which it recommended, inter alia:

> The magnitude of the problem and the probability that media coverage and legal action will intensify, may well lead to a unified public outcry demanding a resolution and even a corporate scapegoat. We, therefore, believe U.S. Gypsum should adopt the third option -- choke off negative publicity at the source.
>
> * * *
>
> We believe that turning around public opinion on this issue -- and therefore getting a chance in court on the liability question -- will require a blend of training, media contact, special analysis, political and regulatory contact, involvement with selected third parties including lawyers, school board officials and others, and more.
>
> * * *
>
> ...The media and other audiences important to U.S. Gypsum should ideally say, "Why is all this furor being raised about this product? We have a non-story."

[TAB Z].

On April 2-9, 1984, S&R tried the first asbestos building case in the nation. Lexington County School District Five v. United States Gypsum Co., C/A No. 82-2072-0 (D.S.C., filed August

15

17, 1982)[tried April 2-9, 1984 and settled April 9, 1984, shortly before going to the jury, for $675,000.00, almost twice the actual damages claimed].    USG called a corporate witness to the stand, through whom USG's then inconsistent discovery responses were revealed to the jury. Within hours, at the urging of other defendants in the courtroom, USG paid Lexington $675,000 for its $378,000 claim.  However, Lexington had no evidence showing what USG really knew about the dangers of asbestos or its giant cover up of "notice" documents located at its corporate headquarters.

USG then responded to this debacle by deciding to carry out H&K's advice to change the mind set of potential plaintiffs and jurors.  Within one month of Lexington, USG met in secret with Grace and National Gypsum Company in Washington, D.C. and formed the SBA.  The SBA has spent millions of dollars (contributed by its member companies) to reduce the members' liability by encouraging building owners to forego the removal of asbestos based upon often incorrect and misleading scientific and technical information prepared with the assistance of counsel for its member companies.  In re School Litigation, 842 F.2d 671 (3d Cir.1987) (holding that the SBA was the alter-ego of its member companies).

SBA's internal minutes confirm the Third Circuit's finding.  These reflect, inter alia, that as early as June 1984, SBA intended (1) to lobby and influence Congress, State Legislatures, and Federal and State Regulatory Agencies;  (2) to influence public thinking and building owner's decisions through a massive public relations campaign using national and local media, as well as the scientific, technical and trade press and (3) "to coordinate and, as necessary, directly interact with these [scientific, medical and building sciences] communities in order to maintain current knowledge, and to the extent practicable, influence the emerging trends and communication . . . The information developed in this effort may have utility, and therefore cost savings, in providing

16

assistance in the underlying litigation." [TAB AA].  Again, the District Court presiding over the

Schools Class specifically found that the SBA materials provided to building owners were

misleading in that they fail to disclose defendants' interest and bias in a building owner's decision

whether to remove asbestos containing building materials.  In re Asbestos School Litigation, 115

F.R.D. 22, 25 (E.D. Pa. 1987).

While USG was organizing its public relations effort, S&R continued to search for the

complete truth concerning USG's early knowledge of the dangers of asbestos.  Because USG

produced documents in response to Judge Wilkins Order that it had never before produced (but no

Saranac documents) S&R filed a Motion for Sanctions against USG for its failure to produce the

1948-late 1960's information in response to previous discovery.  The Motion was heard by Judge

Wilkins on July 12, 1984.  At that time, USG made the following representations to the Court:

> [T]here has been considerable production of documents and discovery and we believe
> we have fully complied with Your Honor's Order [of January 9, 1984].
>
> * * *
>
> We have furnished to Mr. Speights all documents we have been able to locate
> concerning the notice  of possible health hazard.  We have given a list of them and
> given the documents themselves.

Following an extensive hearing, Judge Wilkins ruled that USG had willfully violated discovery

procedures prior to producing the foregoing information in response to his Notice Interrogatory.

Judge Wilkins imposed sanctions of Twenty-Five Thousand and no/100 ($25,000.00) Dollars.  Later

that afternoon, USG's counsel met with Ms. Torrey and other USG officials in Chicago, and

reviewed the boxes of documents originally discovered in 1980 but still not revealed in response to

Judge Wilkins' orders.

17

Over a year after USG made the foregoing representations to the Court, and USG's counsel reviewed the documents, USG began to reveal some (but by no means all) of the information in response to discovery in another school case then scheduled for trial in two weeks. During the trial itself, USG argued against introduction of the 1936 Agreement without ever advising the Court that it had interviewed Mr. Shaver in 1980: "There is no question, he was the secretary-treasurer of U.S. Gypsum Company. We just don't know whether he signed this thing." Further, when Plaintiff attempted to introduce the circumstances surrounding the "lost" laboratory files, USG successfully kept the circumstances of the missing documents excluded based upon the representation that "one small blue folder got missing, that's all".

On November 25, 1985, S&R took the deposition of Ms. Torrey, (limited by USG to the missing laboratory files) who described the missing documents as three quarters of a file drawer several feet high, rather than "one small blue folder," as described by counsel. The following day, another USG witness revealed the 1980 discovery of documents and some of USG's efforts to conceal their existence in discovery in the school cases. Additionally, in connection with the deposition, USG produced for the first time early operating bulletins discussed by Ms. Torrey and Mr. Snell in 1982. As a result of these revelations, Judge Wilkins directed USG to produce all files from which the subject documents were pulled, and conducted a full evidentiary hearing on the circumstances surrounding the failure of USG to produce the information in response to previous discovery and Court Orders. Judge Wilkins ruled that:

> USG, without any legal basis, willfully and intentionally withheld pertinent documents during discovery. In addition, it supplied false and misleading statements in response to interrogatories and requests to produce. USG has persisted in pursuing a course of conduct designed to conceal the truth, despite numerous warnings from this Court that severe sanctions would be imposed for such conduct. Consequently,

sanctions are warranted pursuant to Federal Rule of Civil Procedure 37(b)(2) and the inherent powers of this Court.

Judge Wilkins then imposed additional sanctions in the sum of $50,000.00, plus attorneys fees and costs in the sum of $28,475.39 (The total sanctions and attorneys fees in this case against USG were $95,475.39, more than three times the actual claim, which it previously paid after making an Offer of Judgment). USG paid the sanctions and attorney's fees, and did not appeal the Order.

Undeterred, USG, though its alter ego, continued to push its concealment agenda so that building owners would not do anything about their asbestos-containing products. SBA, which eventually consisted of only USG and Grace, spent millions of dollars in these efforts. [TAB AA]. SBA lobbied the White House, Congressmen and federal agencies. When the Environmental Protection Agency promulgated the 1990 amendments to the NESHAP regulation, the SBA filed suit against EPA, and spent vast sums challenging the regulation. Rather than waste its own limited time and resources on this issue, EPA agreed to settle the SBA suit and issue the EPA NESHAP Clarification of Intent, 58 Fed.Reg. 51,784-01 (Oct. 5, 1993). Although the clarification did not change the actual regulation, it did make sweeping policy statements in accordance with SBA propaganda. Subsequently, the SBA filed suit against OSHA, challenging its regulations on asbestos. 59 Fed.Reg. 40,964-41,162 (August 10, 1994).

Despite the fact that it had no interest in this subject outside of litigation (its member companies long ago stopped selling asbestos products), SBA and its members (including USG's counsel) occupied three seats on the EPA Committee which developed the regulations advising school districts what they should do about asbestos-containing materials. SBA's officers, as well as its member's litigation experts sat on peer review panels for EPA guidance documents and

testimonial publications. Despite having no scientific qualifications, SBA's former president and head lobbyist, John Welch, was a voting member of the ASTM asbestos sub-committee of the indoor air quality committee that decided what standards and test procedures would be endorsed by ASTM as scientifically reliable. In the 1980's and 1990's, the SBA blitzed the country with a massive media campaign and generated proposed state and local statutes and regulations to minimize litigation expenses of its members.

SBA's lobbying efforts also included contact directly with many individual state representatives. SBA directly contacted national and local newspapers in an attempt to influence public opinion. Furthermore, newspaper pieces that were written by the SBA and highlighted the misleading pamphlet "What You Should Know About Asbestos in Buildings" were published in newspapers throughout the country.   See, In re: Asbestos Schools Litigation, 115 F.R.D. 22 (E.D.Pa.1986)[discussion of the content and misleading nature of this publication]. SBA also put their message on the radio waves in a program called "A Question of Safety" which it aired across the country.

As an example of the lengths to which the SBA went to manufacture science, in 1988, the SBA sponsored "the Harvard Symposium," a closed conference in which defense litigation experts were invited to present and publish their work. The information presented at the "symposium" was quickly disseminated by the SBA, which publicized the proceedings in newspapers and radio spots all over the country as a "landmark report." SBA failed to tell that it had contacted Harvard and suggested the symposium and located the co-sponsors. Among those how made presentations at this closed forum were many of USG's litigation experts.

It is against this backdrop that USG has baldly alleged that claimants' claims should be

20

barred by the statute of limitations, assumption of the risk and that claimants cannot prove that USG's asbestos containing surfacing products are hazardous or unreasonably dangerous. Coupled with the USG's track record of losing substantial verdicts and settlements in the tort system, it is clear that USG's objections are patently without merit.

Given this brief history, there is at least an issue of fact as to whether USG conspired with others and attempted to conceal the dangers of asbestos. With far less evidence before it, the District Court in the Schools Class set the case down for trial.

2.    **Exhibits B-E Claims**

USG next asserts that while the now 29 claimants listed on Exhibits B through E "each" supplied some [product identification] documentation," the claimants "have evidenced no independent knowledge relating to the buildings as to which they have filed claims." Objection at 4.[2] This Court rejected this precise objection in the Grace proceedings, which USG has been closely monitoring:

> MR. BIANCA:  The St. Vincent's Hospital addition claim, which is claim number 11193, attaches a one-page article merely saying that acoustical plaster was used on the addition. It doesn't include any other information. It's the only documentation provided for the claim, and that just doesn't establish that, you know, the acoustical plaster was asbestos containing. It doesn't establish that it was plaster was a Grace asbestos-containing product. Accordingly, this claim must also be denied.
>
> * * *
>
> MR. SPEIGHTS:  And lastly, on the Vincent's Hospital addition in Erie, Pennsylvania I have a portion fo [sic from] a publication called Plastering Industries, which is an authentic document under the rules, which says that K.E. Nightlinger and Son, plastering contractors in Erie, Pennsylvania, have finished fireproofing the new two million dollar addition of St.

---

[2]The Objection lists 50 claimants in Exhibits B-E, but as a result of withdrawals, the correct total is 28 broken down as follows: B - 10; C - 10; D - 3; and E - 6.

Vincent's Hospital there, and it has 6,800 yards of Vermiculite Acoustical Plastic sprayed directly to cellular steel floors, and, of course, I believe it's in the records of this bankruptcy Vermiculite Acoustical Plastic – that's P-l-a-s-t-i-c – is the brand name of W.R. Grace's and its predecessor's ceiling material like Monaco for beams. So I think we have proved product I.D. for all three of these buildings by documentation.

Now, that survives a motion to strike. If they want to argue how much is there or what happened to it, or they want to engage in discovery, this is an objection process, and they've got every right to do it. But I think we've met the threshold with written documentation on those three claims. I don't think I missed another one. It's Coca Cola, Cal State, and those three claims. If I missed another one, I'll be glad to address that.

MR. BIANCA: Before we get into the Methodist Hospital, Bayshore Community Hospital, and St. Vincent's Hospital claims again, I just wanted to correct Mr. Speights' burden of proof argument. It is not the debtor's burden in this case to show that there is not a Grace asbestos-containing product on these properties. It is the claimants' burden to show that the product is there, and that there's a legal basis for the claim.

THE COURT: I agree, but if with respect to those three claims he has produced invoices that are Grace's invoices that show that it used its Monaco [sic] product, it was delivered to a building, that's pretty good evidence that, in fact, there's a claim. At least it's enough to get past the motion to strike the claim.

Hearing (January 25, 2006) at 53-57. After Grace again argued that an article saying a contractor installed Vermiculite Acoustical Plastic "doesn't indicate any kind of product identifica [sic identification]," the Court reiterated:

THE COURT: Vermiculite Acoustical Plaster – Plastic, and that's Grace's brand name, I mean what more do you need? You don't have a very high burden of proof with respect to the initial product I.D. It may turn out that that's not enough after some discovery, but that's certainly enough to get past the motion to strike a claim.

Id. at 58.

Finally, to the extent that USG insists that PD claimants must invest substantial sums to verify product identification, then PD claimants should be allowed to wait until after USG responds to the request for admissions S&R has served seeking USG to admit the obvious fact that they supplied products to the buildings in question. To the extent USG denies any of these requests for

22

admissions, the claimants can then have constituent analysis performed on the samples, to verify that

the product was manufactured by USG, and seek to have USG pay for these substantial costs in light

of its refusal to admit the obvious.[3]

## B.    USG's Remaining Objections Should Be Dismissed

Over three years after USG received all PD claims in response to the bar date, and, in some

instances, many years after it had litigated against claimants in the tort system, USG added a kitchen

sink objection to claims filed by 72 claimants set forth in Exhibit F.[4]  Remarkably, USG admits that

it has no concrete basis to object to any of these claims:

> Debtors have not received information necessary to formulate all of the substantive
> objections beyond those based on lack of product identification and , in a few cases, based
> on the statute of limitations.  No discovery has yet been taken to develop the required
> information additional information."

Objection at 7; Affidavit of Brady L. Green In Support of Debtors' Objection (April 10, 2006) at

3.  Instead, USG brazenly asserts numerous objections "that are likely to apply to the claims based

upon its historical experience in the litigation before the bankruptcy."  Objection at 8.[5]

---

[3]The procedure is certainly familiar to USG.  In one asbestos PD trial in federal court, USG
refused to admit the authenticity of an advertisement (did USG believe that S&R had a printing press?),
and the plaintiff had to expend some expense sending someone to Washington, D.C., to get a certified
copy of the document.  Upon return, the district court ordered that USG would have to pay all the
expenses in proving that fact. [TAB BB].

[4]The Objection lists 201 claimants, but as a result of withdrawals, the correct total is 72.

[5]USG asserts that the subject claims might be barred by one or more of the following: statute of
limitations; failure to provide evidence of product identification; statutes of repose; laches; previously
adjudicated claims; previously settled claims; assumption of risk; no compensable injury; alleged injury
or damages resulted from governmental requirements; alleged injury or damages resulted from actions or
products of third parties; claims for which any alleged injury or damages resulted from claimants'
comparative or contributory fault; claims lacking adequate proof of damages; claims seeking
impermissible damages or recovery; and other grounds for objection "that may be available."  Objection
at 8-17.

If that was not enough, USG then blames everybody but itself for its offering up a pleading devoid of the minimum requirements imposed by the rules which govern this Court and its counsel.[6] Not even Grace had the gall to object to PD claims without making an argument and citing some facts and law. The reality is that USG always thought that PD claims would either be processed by a claims facility, like in all other PD bankruptcies, and then, more recently, expected that PD claims would pass to the tort system as advertised. Only recently when USG gave its lawyers new marching orders did it have to cut and paste something together.

How is S&R supposed to respond to this Agent Orange attack on all of its claims based on its counsel experience in the tort system? One would think that even USG would suggest that it is filing objections without a good faith basis with the intent on asking this court to litigate and see what it can find. That would be troubling – like the plaintiff's lawyer suing a product manufacturer because someone is hurt and it is his experience that the manufacturer is always to blame. But what USG has done is worse. It has filed an Objection, admitted that it does not have sufficient evidence, and then has proposed that the Court should disallow all of the claims. Objection at 18; Proposed Order at 1.

But it is worse, much worse, than that. USG is not, contrary to its representations to the Court, operating without information necessary to formulate it objections, at least with respect to some of the claims which it wants this Court to summarily disallow. The true facts with respect to several illustrative claims USG included in its Exhibit F raise very serious questions about the USG's pleading:

---

[6]For example, USG blames this Court's Local Rule 3007-1, which has been on the books from the outset of its bankruptcy; its previous approach to PD claims, which it alone chose; and its failure to take any discovery "to develop the required additional information." Objection at 7-8.

1.    **Anderson Memorial Hospital**

Much has been said and argued about Anderson's class action assertions in this and other

bankruptcies, but no Debtor before now has had the audacity to suggest that it did not have sufficient

evidence to formulate its objections to its individual claim. USG, through the same law firm which

provided the above affidavit and which has represented USG in South Carolina since 1982, including

the defense of the Anderson case, knows all of the facts that it could ever want to know about

Anderson's individual claim. It litigated the matter in South Carolina for eight years. It filed

motions, served written discovery, examined boxes and boxes of the hospital's documents, took the

depositions of the hospital employees, and participated in a two day hearing when its co-defendants

challenged the adequacy of the hospital as a class representative. The case was essentially ready for

trial at the time of the bankruptcy.

USG states that based on its experience it should be able to present a product identification

defense, arguing that the traditional method is constituent analysis, when in fact it was served with

the constituent analysis demonstrating that USG's product is in one of Anderson's buildings on

October 2, 1997. [TAB CC]. USG argues that it might prevail under the doctrine of economic loss,

when that doctrine has been expressly rejected by the South Carolina Supreme Court in a case

upholding a verdict against USG, as well as the United States Court of Appeals for the Fourth

Circuit, upholding a verdict against W.R. Grace. See, Kershaw County Board of Education v.

United States Gypsum Co., 302 S.C. 390, 396 S.E.2d 369 (1990); and City of Greenville v. W.R.

Grace & Co., 640 F.Supp. 559 (D.S.C. 1986), aff'd, 827 F.2d 975 (4th Cir. 1987). USG asserts that

it might avail itself of the statute of repose, even though it has never made such a motion in South

Carolina -- not in Anderson, the colleges class, or any of the other cases it has litigated since 1982,

and even though it obviously knows that the South Carolina Circuit Court with statewide jurisdiction quickly denied such a motion when made by another defendant. [TAB DD]. USG argues that a statute of limitations might have expired years before 1992, when Anderson was one of the earliest commercial building owners to commence an asbestos PD action, even though USG never filed a motion for summary judgment in the underlying case and never prevailed on a statute of limitations argument in the years it litigated in South Carolina. USG argues laches at the same time it argues that Anderson still has no injury, and even though, as set forth above, no defendant has more unclean hands. USG objects to any fraudulent concealment argument, even though it knows what Judge Wilkins found and it did not appeal. The truth is that USG knows all the facts about Anderson, and knows the law of South Carolina where it has been litigating and losing asbestos PD cases since the early 1980's.[7] Yet, USG asserts that based on its experience, it would prevail on its defenses above, even though it has never prevailed on any of those defenses in South Carolina during its eighteen years of litigation in South Carolina before the bankruptcy.

---

[7]USG has tried and settled a number of asbestos property damage lawsuits in South Carolina, including Peter W. Harley, III v. United States Gypsum Co., et al., Case No. 82-CP-40-1215 (Ct. Common Pleas, Richland County, South Carolina); Lexington County School District Five v. United States Gypsum Co., C/A No. 82-2072-0 (D.S.C., filed August 17, 1982)[tried April 2-9, 1984 and settled April 9, 1984, shortly before going to the jury, for $675,000.00, almost twice the actual damages claimed]; Greenville County School District v. United States Gypsum Co, C/A No. 82-3142-14 (D.S.C., filed December 15, 1982) [USG's offer of judgment accepted July 1984]; Richland County School District One v. W.R. Grace & Co., Case No. 82-CP-403050, (SC Ct. Of C.P., Richland County, filed 7-13-82) [settled September 1984]; Spartanburg County School District Seven v. National Gypsum Co., C/A No. 6:83-1744-3 (D.S.C., filed July 23, 1983), vacated and remanded in part, 805 F.2d 1148 (4th Cir. 1986), verdict on retrial aff'd, 842 F.2d 1292 (4th Cir. 1988)[verdict for plaintiff against USG for $106,107]; Kershaw County Board of Education v. United States Gypsum Co., 302 S.C. 390, 396 S.E.2d 369 (1990) (affirming jury verdict of $225,000 compensatory damages); Charleston County School District v. United States Gypsum Company, D.S.C., Charleston Division, C/A No. 2:89-2131-1 filed 8/25/89 [settled]; University of South Carolina v. W.R. Grace & Co., et al., Case No. 86-CP-38-658 (S.C. Common Pleas, Richland County) [settled]. See also Central Wesleyan College v. W.R. Grace & Co., 143 F.R.D. 628 (D.S.C. 1992), aff'd 6 F.3d 177 (4th Cir. 1993) [certification of nationwide class action against USG and other defendants].

Anderson could go on and on about the absurdity of USG suggesting that based on its experience, Anderson's claim cannot survive. The simple fact is that USG has had fourteen years to fish or cut bait, and it has produced nothing in support of its objection to Anderson's individual claim.

### 2. West Coast Estates

USG likewise has objected to the claims of West Coast Estates, which has a long history with USG regarding its multi-story office building in downtown San Francisco. Specifically, on March 17, 1988, West Coast Estates and USG entered a tolling agreement, which was periodically renewed and remained in affect until 1998. [TAB EE]. In that year, West Coast Estates instituted its lawsuit against USG in San Francisco, and USG defended through its national counsel, who have filed the above affidavit in support of the present motion. West Coast Estates, Crocker Plaza Company, McKesson Corporation v. United States Gypsum Company, et al., Cal. Sup. Ct., San Francisco County, No. 996436. From 1998 until the bankruptcy, the lawsuit was fully litigated in the tort system and was approaching trial at the time of the bankruptcy. USG took extensive discovery including four sets of requests for production of documents, over one hundred special interrogatories, and numerous depositions of the plaintiff's witnesses and employees. USG and its experts also inspected the building and had a full opportunity to take whatever samples USG needed to develop its defense. Finally, USG had full discovery of the plaintiff's abatements projects, which prior to the bankruptcy approached $20 million, with approximately that much more to go.

Like Anderson, USG also had a full opportunity to file any dispositive motions it wanted to file with respect to this claim. Like Anderson, such motions would have failed. For example, with respect to USG's suggestion that it might have a statute of limitations defense, not only was the

tolling agreement entered into in 1988, but three years before this claimant filed its lawsuit the California appellate court held in the San Francisco school asbestos case that the statute of limitations does not accrue until the building owner knows or should have known that its property has been contaminated from the defendant's asbestos product. San Francisco Unified School District v. W.R. Grace & Co., 44 Cal.Rptr.2d 305 (Cal.App., First Dist., Div. 4 1995)["SFUSD"]. In its present objection, USG has asserted that there is no injury to the building. Objection at 15-16.

### 3. North Dakota Buildings

USG's knowledge is not limited to just the pre-filed cases. For example, USG through its national counsel, who are pursuing the present Objections, litigated asbestos PD cases in North Dakota for a number of years before the bankruptcy. S&R tried two cases to verdict against USG in North Dakota, both resulting in verdicts of actual and punitive damages. Hebron Public School District No. 13 of Morton County, State of North Dakota v. United States Gypsum Company, 953 F.2d 398 (8th Cir. 1992); Tioga Public School # 15 of Williams County, State of North Dakota v. United States Gypsum Company, 984 F.2d 915 (8th Cir. 1993). In addition, S&R litigated and settled a lawsuit against USG brought by the State of North Dakota. United States Gypsum Company v. State of North Dakota, and Heidi Heitkamp, Attorney General for the State of North Dakota, C/A No. 94-C-2099 (S. Central Judicial District Ct., Burleigh County, North Dakota).

Nonetheless, USG has the temerity to argue that certain objections might apply to North Dakota claimants not only in the face of authority against it, but in the face of direct holdings in cases which USG litigated. For example, while USG in its objections argues the Adams-Arapahoe case for the proposition that the claims may be barred, it knows that it lost this precise issue in the United States Court of Appeals for the Eighth Circuit. Tioga Public School # 15 of Williams

County, State of North Dakota v. United States Gypsum Company, 984 F.2d 915 (8th Cir. 1993).

Although it cites the fact that the statute of limitations may bar North Dakota claims, citing a Third

Circuit case, it knows that the Eighth Circuit relied on Tioga and hold that the statute of limitations

does not commence in North Dakota until the building owner knows or should have known that the

asbestos-containing product at issue contaminated other products in the building. Montana-Dakota

Utilities Co. v. W.R. Grace & Co., 14 F.3d 1274 (8th Cir. 1994). USG asserts that the North Dakota

claims may be barred by the statute of repose, even though it lost that precise issue in the North

Dakota Supreme Court. Hebron Public School District of Morton County v. United States Gypsum

Co., 475 N.W.2d 120 (N.D. 1991).

## CONCLUSION

USG's Tenth Omnibus Objection and Motion to Disallow Asbestos Property Damage Proofs

of Claim for Failure to Provide Product Identification Evidence (Substantive Objection) should be

denied.

FERRY, JOSEPH & PEARCE, P.A.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899
(302) 575-1555

-and-

SPEIGHTS & RUNYAN
Daniel A. Speights (SC Bar No. 4252)
200 Jackson Avenue, East
Post Office Box 685
Hampton, South Carolina 29924
(803) 943-4444

Dated: May 1, 2006                          Co-Counsel for the Speights and Runyan Claimants

29